**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| GARY BREEDLOVE, ) | CASE NO. 1:15-CV-39 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| v. ) | VECCHIARELLI |
| ) | |
| CAROLYN W. COLVIN, ) | |
|    Acting Commissioner of Social ) | |
|    Security, ) | **MEMORANDUM OPINION AND** |
| ) | **ORDER** |
| Defendant. | |

Plaintiff, Gary Breedlove ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423. ("Act").  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this Memorandum Opinion and Order.

## I. PROCEDURAL HISTORY

On September 30, 2011, Plaintiff filed his application for POD and DIB alleging a disability onset date of May 15, 2008.  (Transcript ("Tr.") 16, 148.)  The claims were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 86, 103.)  On February 12, 2013, an ALJ held Plaintiff's hearing.  (Tr. 34.)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id*.)  A vocational expert ("VE") also participated and testified.

(*Id*.) On March 25, 2013, the ALJ found Plaintiff not disabled. (Tr. 16-24.) On December 10, 2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On January 8, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12, 16, 17.)

Plaintiff asserts the following assignment of error: The ALJ erred in evaluating the opinion of Plaintiff's treating physician.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was born on June 18, 1961, and was 52-years-old on the date of the administrative hearing. (Tr. 22, 41.) On the date last insured, Plaintiff was considered a younger individual age 18 to 49, but subsequently changed age category to closely approaching advanced age. (*Id.*) He had at least a high school education and was able to communicate in English. (Tr. 23.) He had past relevant work as a restaurant cook, security guard, manufactured homes builder, housekeeping cleaner, grocery stocker, and taxi driver. (Tr. 22.)

### B. Medical Evidence

#### 1. Dr. Stephens

During November 2006, Plaintiff had an orthopedic consultation with Susan Stephens, M.D., for chronic low back pain. (Tr. 286.) At the time of the consultation, Plaintiff was employed and had unsuccessfully tried steroid blocks, pain medication,

and physical therapy. (*Id.*)  Treatment notes from University Hospital showed that Plaintiff had attended three out of eight physical therapy sessions for his low back pain earlier in 2006. (Tr. 371-74.)  Dr. Stephens performed a physical examination that revealed tenderness and a decreased range of motion in the lumbosaral spine. (Tr. 286.)  Straight leg raising tests were positive, but Plaintiff's neurological examination was normal. (*Id.*)  Dr. Stephens diagnosed lumbar disc degeneration. (*Id.*)  She ordered an MRI, which showed degenerative fact joint disease at L3-L4 and L4-L5, and mild central spinal stenosis at L4-L5. (Tr. 281.)

Plaintiff returned to Dr. Stephens in December 2006. (Tr. 285.)  Dr. Stephens diagnosed lumbar canal stenosis and performed a physical examination, which showed no changes in Plaintiff's lumbosacral spine. (*Id.*)  The doctor prescribed epidural blocks and follow up in six weeks. (*Id.*)  Later that month, Plaintiff underwent an epidural steroid injection. (Tr. 532.)

**2.  Dr. Piszel**

Plaintiff also treated with Bruce Piszel, M.D., for his low back pain. (Tr. 292.)  In May 2009, Dr. Piszel indicated that Plaintiff was taking Oxycodone for pain, and the doctor diagnosed lumbar spondylosis. (*Id.*)  Plaintiff underwent an epidural steroid injection. (Tr. 294.)

During March 2011, Plaintiff returned to Dr. Piszel and reported 75 percent relief with Oxycodone. (Tr. 413.)  On physical examination, Plaintiff had mild pain bilaterally in his shoulders with some range of motion issues, as well as tenderness in the lumbosacral and thoracic spine. (Tr. 414.)  Plaintiff returned for refills of Oxycodone in

June 2011, September 2011, December 2011, and February 2012. (Tr. 404, 407, 410, 476-79.)  In June 2011, Dr. Piszel recommended a cane for radiating leg pain. (Tr. 412.)

During April 2012, Plaintiff reported that medication decreased his back pain 50 to 75 percent, his pain was aggravated by daily activities, and pain radiated into his right leg. (Tr. 482.)  A physical examination showed moderate tenderness in the lumbosacral facets and a moderately positive straight leg raising test on the right side. (Tr. 484.)  Dr. Piszel diagnosed lumbar spondylosis and neuritis. (*Id.*)  In August 2012, a physical examination showed mild tenderness in the lumbosacral facets and a mildly positive straight leg raising test on the right. (Tr. 558.)  During an October 2012 treatment session, a physical examination revealed mildly positive straight leg raising on the left side. (Tr. 554.)

A November 2012 MRI of the lumbar spine showed mild central canal and foraminal stenosis at L5-S1; disc bulge with mild and foraminal stenosis at L4-L5; and mild disc bulge at L2-L4. (Tr. 487.)  There had been no significant changes from an MRI performed in May 2009. (*Id.*)  Plaintiff returned to Dr. Piszel for a medication refill in January 2013. (Tr. 551.)

    3.    **Dr. Tchelidze**

Plaintiff presented to primary care physician Teah Tchelidze, M.D., for the first time on September 9, 2010, to treat a cough. (Tr. 431.)  On a "problem list," the doctor noted that Plaintiff had degenerative joint disease (DJD) and used a "TENS" unit, which were linked to Dr. Piszel. (*Id.*)  At the time, Plaintiff was working as a painter and

reported a history of DJD, epidural blocks, chronic pain management, and chronic constipation. (*Id.*) Plaintiff also complained of pain in his right shoulder radiating into his neck, down his arm, and in his elbow. (*Id.*) Dr. Tchelidze noted that Plaintiff was morbidly obese and weighed 345 pounds. (*Id.*) The results of a physical examination were normal, aside from tenderness in part of Plaintiff's right shoulder. (*Id.*) Plaintiff was treated for right subacromial bursitis (inflammation in the shoulder) and acute bronchitis. (*Id.*)

On September 23, 2010, Plaintiff returned to Dr. Tchelidze for a review of blood work. (Tr. 430.) His neck pain had improved. (*Id.*) A physical examination revealed no muscular or skeletal abnormalities. (*Id.*) Plaintiff was diagnosed with diabetes. (*Id.*) On October 10, 2010, Dr. Tchelidze saw Plaintiff for issues with his cholesterol medication. (Tr. 444.) The doctor treated Plaintiff for diabetes, fatty liver, and obesity. (*Id.*) He discussed the importance of routine exercise and diet. (*Id.*)

In March 2011, Plaintiff returned to Dr. Tchelidze for diabetes and a shoulder sprain caused by lifting heavy objects. (Tr. 428.) Dr. Tchelidze's treatment notes refer to an underlying history of DJD and chronic back pain. (*Id.*) Plaintiff had been taking pain and anti-inflammatory medication for his shoulder with no relief. (*Id.*) A physical examination showed tenderness at the right subacromial bursa. (*Id.*) Dr. Tchelidze observed that Plaintiff had improved control over his diabetes and hypertension. (*Id.*) The doctor provided a steroid injection for Plaintiff's shoulder and recommended a muscle relaxer and anti-inflammatory. (*Id.*)

In February 2012, Plaintiff presented to Dr. Tchelidze for depression. (Tr. 427.)

5

Plaintiff experienced depression, which he related to his mother's death, along with low motivation and energy. (*Id.*) The physician advised Plaintiff of the importance of exercise and prescribed an antidepressant. (*Id.*) Plaintiff returned to Dr. Tchelidze on March 22, 2012, for bronchitis and depression. (Tr. 441.) The doctor strongly advised smoking cessation. (*Id.*) Plaintiff's diabetes was poorly controlled. (*Id.*) Dr. Tchelidze changed Plaintiff's antidepressant medication, noting that the new medication may benefit Plaintiff's chronic back pain and radiculopathy symptoms. (*Id.*)

On January 29, 2013, Plaintiff returned to Dr. Tchelidze for a "follow up." (Tr. 565.) The physician recounted Plaintiff's history of diabetes, DJD, hyperlipidemia, fatty liver, and generalized anxiety. (*Id.*) Plaintiff experienced depression, anxiety, and fatigue; he had been having difficulty with weight loss, exercise, and controlling his blood glucose. (*Id.*) Dr. Tchelidze noted that Plaintiff saw Dr. Piszel for pain management and was taking 180 mg of Oxycodone per day. (*Id.*) Plaintiff reported severe, uncontrolled low back pain shooting into both legs. (*Id.*) He had not seen an orthopedic spine specialist recently nor had he attended physical therapy in the past 6 months. (*Id.*) Plaintiff's musculoskeletal, neurological, and joint examinations were normal. (*Id.*) Dr. Tchelidze reviewed Plaintiff's most recent MRI, which showed moderate facet changes and mild canal stenosis at L5-S1, diffuse disc bulges at L4-L5 and L2-L3, a mild disc bulge at L3-4, and moderate central canal stenosis at L4-L5. (*Id.*)

Dr. Tchelidze diagnosed chronic back pain, lumbago, and disc bulge with moderate canal stenosis at L4-L5. (*Id.*) The doctor felt that Plaintiff was dependent on opiate medication and advised tapering down Oxycodone while substituting non-

6

narcotic medication. (*Id.*)  Dr. Tchelidze strongly recommended an evaluation by an orthopedic spine specialist, as well as physical therapy, epidural blocks, or an evaluation for tentative surgical intervention. (*Id.*)  Dr. Tchelidze also prescribed weight loss and increased Plaintiff's antidepressant prescription. (*Id.*)

That same day, Dr. Tchelidze completed a pain questionnaire. (Tr. 529.)  The questionnaire form prompted Dr. Tchelidze to list all of the patient's mental and physical impairments and "state which ones are capable of producing pain." (*Id.*)  Dr. Tchelidze listed the following impairments, but did not specify which conditions produced pain: DJD of the lumbar spine with disc bulge and spinal cord compression, radiculopathy, chronic lumbago, sciatica, depression, anxiety, uncontrolled diabetes mellitus, obesity, and hyperlipidemia. (*Id.*)  Dr. Tchelidze felt that there was a psychological component to Plaintiff's pain and listed anxiety and depression. (*Id.*)  The doctor opined that Plaintiff's experience of pain was "constantly" severe enough to interfere with his attention and concentration. (*Id.*)

### 4. Agency Reports

On January 27, 2012, clinical psychologist Richard Halas, M.A., conducted a consultative psychological examination of Plaintiff. (Tr. 416-21.)  Mr. Halas wrote that Plaintiff had depression subsequent to his health issues and unemployment. (Tr. 421.)  Plaintiff had diminished physical capacities, used a cane that day to walk, seemed uncomfortable sitting, and had difficulty standing at the end of the appointment. (*Id.*)  Mr. Halas diagnosed depressive disorder and anxiety disorder. (Tr. 418.)  In regard to mental limitations, Plaintiff had no deficits in understanding, remembering, and carrying

7

out instructions or in maintaining attention, concentration, persistence, or pace. (*Id*.) Mr. Halas also opined that Plaintiff would have "some problems" interacting effectively and appropriately with coworkers, supervisors, and the public. (*Id.*) Additionally, Plaintiff would have "problems" in responding appropriately to work pressures, because his symptoms of anxiety were likely to become exacerbated under the pressures of a normal work setting. (*Id.*)

In January 2012, state agency physician Lynne Torello, M.D. reviewed the record to evaluate Plaintiff's physical limitations. (Tr. 79-80.) She opined that Plaintiff could lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for six hours in an eight-hour workday; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. (*Id.*)

In February 2012, state agency psychologist Robyn Hoffman, Ph.D., assessed Plaintiff's mental limitations after reviewing the record. (Tr. 80-82.) Dr. Hoffman opined that due to anxiety and depression, Plaintiff's tasks should not pressure him to meet strict time or quantity demands. (Tr. 81.) In addition, work should involve only superficial interaction with others and no contact with the public. (Tr. 82.)

During June 2012, state agency physician William Bolz, M.D., affirmed the January 2012 opinion of Dr. Torello, except that Dr. Bolz found Plaintiff could frequently balance. (Tr. 95-97.) State agency psychologist Vicki Warren, Ph.D., also conducted a review of the record in June 2012, and she agreed with Dr. Hoffman's mental residual functional capacity in total. (Tr. 97-98.)

8

**C.     Hearing Testimony**

    **1.     Plaintiff's Hearing Testimony**

Plaintiff testified that he last worked in May 2008 emptying garbage cans at Lake Hospital System, which required lifting up to 25 pounds. (Tr. 44.)  Plaintiff left the position after six weeks because of physical pain. (*Id.*)  Plaintiff performed some window painting for an uncle in September 2010. (Tr. 60.)  He shared a home with his wife and washed dishes, vacuumed, and swept wood floors with broom. (Tr. 42.)  Plaintiff and his wife went grocery shopping together, but did so in the early hours of the morning to avoid crowds. (Tr. 43.)  Plaintiff held onto the cart while walking around the store and did not lift groceries. (Tr. 55.)

Plaintiff presented at the hearing with a cane, which he had used for approximately eight months due to numbness in his left leg. (Tr. 51.)  He estimated that he could stand for 25 minutes, but would be in pain the entire time, and could lift up to 14 pounds. (Tr. 53, 55.)  Plaintiff asked to stand during the hearing due to pain shooting down his right leg and in his lower back. (Tr. 53-54.)  Plaintiff no longer experienced shoulder pain. (Tr. 57.)  He took 30 milligrams of Oxycodone daily for his back. (Tr. 55.)  Plaintiff explained that his blood sugar level was always above 100, though it should measure between 80 and 100. (Tr. 56.)

When asked whether he followed his physician's directive to exercise five times a week for 30 to 40 minutes, Plaintiff said that he had not used his exercise bike since 2010 due to pain. (Tr. 61.)  He sometimes walked up and down his driveway and to the end of his street, which was less than an eighth of a mile. (Tr. 61-62.)

9

### 2. Vocational Expert's Hearing Testimony

Gene Birkhammer, a vocational expert, testified at Plaintiff's hearing. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 65-66.) The individual would able to occasionally lift 20 pounds; frequently lift 10 pounds; stand and walk six hours total during an eight-hour workday; had an unlimited ability to push and pull other than shown for lifting and carrying; could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 66.) In addition, the individual could perform tasks that did not require a fast-pace or high production quotas; could interact superficially with others, meaning for a short duration and for a specific purpose; and could not perform tasks that required direct contact with the general public. (*Id.*) The individual was further limited low stress work, meaning work that did not involve arbitration, negotiation, responsibility for the safety of others, or supervisory responsibility. (Tr. 67.) The VE testified that the hypothetical individual would be capable of performing such jobs as a mail clerk, dietary aide, and small products assembler. (*Id.*)

### III. STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2012.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of May 15, 2008, through his date last insured of September 30, 2012.

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease, obesity, osteoarthritis, diabetes mellitus, anxiety disorders (panic attacks), affective disorder (depression).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except:
    - He is able to occasionally lift 20 pounds and frequently lift 10 pounds.
    - He is able to stand and walk 6 hours of an 8-hour workday and is able to sit for 6 hours of an 8-hour workday, with unlimited push/pull other than shown for lift and/or carry.
    - He can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl.
    - He can perform tasks with no fast pace or high production quotas.
    - He can interact superficially with others (meaning of a short duration for a specific purpose, and tasks should not require direct contact with the general public.)
    - He can perform low stress work meaning no arbitration, negotiation, responsibility for the safety of others, or supervisory responsibility.

6. Through the date last insured, the claimant was unable to perform any past relevant work.

7.  The claimant was born on June 18, 1961, and was 51-years-old, which is defined as a younger individual age 18-49, on the date last insured. The claimant subsequently changed age category to closely approaching advanced age.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant was not under a disability, as defined in the Social Security Act, from March 15, 2008, through September 30, 2012, the date last insured.

(Tr. 18-24.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the

evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard,* 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy,* 594 F.3d at 512.

### B.    Plaintiff's Assignment of Error

Plaintiff argues that the ALJ violated the treating physician rule with respect to Dr. Tchelidze, Plaintiff's primary care physician. Plaintiff initiated treatment with Dr. Tchelidze on September 9, 2010, and treated with the physician on six more occasions through January 2013. On January 29, 2013, Dr. Tchelidze completed a pain questionnaire and opined that Plaintiff's pain was "constantly" severe enough to interfere with his attention and concentration. (Tr. 529.) The ALJ assigned little weight to Dr. Tchelidze's opinion, finding that Plaintiff "did not see Dr. Tchelidze for his back pain, and his notes show nothing regarding [Plaintiff's] spinal condition." (Tr. 22.) Plaintiff argues that the ALJ's explanation for assigning less than controlling weight to Dr. Tchelidze's opinion does not satisfy the "good reasons" requirement of the treating source rule.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  See *Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain her reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id*.

The Commissioner asserts that the ALJ did not improperly analyze Dr. Tchelidze's opinion because Dr. Tchelidze did not qualify as a "treating source"[1] with

---

[1] A treating source is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502.  Generally, an ongoing treatment relationship exists when the patient sees or has seen the treating source with a frequency consistent with accepted medical practice for the type of evaluation required for the medical condition at issue.  *Id.*  "Classifying a medical source requires us to interpret the definitions in [20 C.F.R.] § 404.1502, a question of law we review *de novo*."  *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 876 (6th Cir. 2007).

regard to Plaintiff's back condition. The Commissioner's argument that treating source analysis does not apply rests on the assumption that Dr. Tchelidze based his opinion solely on Plaintiff's back impairment. On the pain assessment form, however, there is no indication that Dr. Tchelidze based his opinion about Plaintiff's ability to maintain attention and concentration on Plaintiff's back impairment. The physician did not indicate which of the many conditions listed on the form caused Plaintiff's pain. The physician did, however, opine that there was a psychological component to Plaintiff's allegations of pain, noting Plaintiff's anxiety and depression. (Tr. 529.)

It is not entirely clear from her decision whether the ALJ considered Dr. Tchelidze to be a treating source, as the ALJ did not make a definitive finding on the record. Plaintiff treated with Dr. Tchelidze on seven occasions over the course of two and one-half years before the doctor completed the pain assessment form. Dr. Tchelidze's treatment notes from this period acknowledged the various impairments the doctor listed on the pain assessment form, including Plaintiff's back conditions, anxiety, and depression. As Plaintiff had an on-going treatment relationship with Dr. Tchelidze, there is substantial evidence from which the ALJ could have concluded that Dr. Tchelidze is a treating source, and it is not clear what evidence, if any, supports a contrary conclusion. Thus, the case must be remanded for a supported determination by the ALJ as to whether Dr. Tchelidze was a treating source.

If Dr. Tchelidze was a treating source, the ALJ would have been required to meet the "good reasons" requirement of the treating physician rule. The ALJ's reasons for

---

> This Court must accord substantial deference to any factual finding by the ALJ bearing on the question. *Id.*

16

discounting the physician's opinion–that Plaintiff "did not see Dr. Tchelidze for his back pain" and that the doctor's notes said "nothing regarding Plaintiff's spinal condition"–are not supported by the record, are incorrect, and are inconsistent with other aspects of the ALJ's opinion.[2]  The reasons are also inconsistent with Dr. Tchelidze's records, which indicate that the physician was aware of Plaintiff's back conditions during the numerous treatment sessions that preceded his completion of the pain assessment form.[3]  As a result, the ALJ failed to offer good reasons for her ultimate determination that the opinion was entitled to little weight.[4]  Accordingly, the ALJ's unsatisfactory

---

[2] In her opinion, the ALJ even acknowledged that Dr. Tchelidze recommended a surgical consult for Plaintiff's back during a January 2013 evaluation. (Tr. 21, 565.)

[3] For example, during September 2010, when Plaintiff established care, and again in March 2011, Dr. Tchelidze noted Plaintiff's history of DJD, epidural blocks, chronic back pain, and chronic pain management. (Tr. 428, 431.) During March 2012, Dr. Tchelidze prescribed Cymbalta for depression and specifically noted that given Plaintiff's chronic back pain and radiculopathy, the drug could help with Plaintiff's symptoms. (Tr. 441.) Additionally, notes from Dr. Tchelidze's January 2013 treatment session indicate that Dr. Tchelidze reviewed a lumbar spine MRI, suggested that Plaintiff substitute other medications for opiates taken to reduce back pain, and encouraged Plaintiff to pursue intervention such as physical therapy or epidural blocks. (Tr. 565.)

[4] This is not a case in which the ALJ's discussion of other medical opinions in the record provides a clear basis for rejecting the treating physician's opinion.  *See, e.g., Nelson v. Comm'r of Soc. Sec.,* 195 F. App'x 462, 470-71 (6th Cir. 2006) (finding that the ALJ's discussion of other medical evidence and opinions made it clear that the opinions of the claimant's treating physicians were inconsistent with the record evidence as a whole and, thus, "implicitly provided" sufficient reasons for rejecting their opinions).  Rather, the ALJ's discussion of other medical opinions in the record relative to Plaintiff's limitations is similarly brief and conclusory. For example, the ALJ accorded great weight to the opinions of state agency reviewers Drs. Warren and Bolz, but stated only that their findings were

explanation for rejecting Dr. Tchelidze's opinion frustrates the dual purpose of the "good reasons" requirement: It neither sufficiently describes to Plaintiff the basis for the ALJ's conclusions, nor provides the Court with adequate material for meaningful review.[5]  For these reasons, Plaintiff's case is remanded to the ALJ for a specific determination as to whether Dr. Tchelidze is a treating source and for a more complete examination of Dr. Tchelidze's January 2013 opinion.  If the ALJ determines Dr. Tchelidze is a treating physician and declines to assign the opinion controlling weight, the ALJ should include reasons supported by the record for why she reached that conclusion.

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this Memorandum Opinion and Order.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: October 5, 2015

---

consistent with the results of physical and psychological clinical examination results. (Tr. 22.)

[5]   The Commissioner argues that the RFC is not "inherently inconsistent" with Dr. Tchelidze's opinion, which indicated that Plaintiff's pain constantly interfered with attention and concentration "to an unspecified degree." According to the Commissioner, the RFC's limitations prohibiting fast-paced work with high production quotas adequately accommodates any limitations. It is not clear to the Court that the RFC accommodates Dr. Tchelidze's opinion. During the administrative hearing, the VE testified that there would be no jobs available for an individual who would be off task approximately 15 percent of the workday due to problems with anxiety, depression, or chronic pain, even if the individual was not required to perform at a fast pace or meet production quotas. (Tr. 68.) Additionally, the ALJ did not reject Dr. Tchelidze's opinion because it lacked specificity.